**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **REGINALD JEROME HALL,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:11-CV-1929-BH** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the consent of the parties and the *Order Reassigning Case*, dated October 12, 2011, this case has been transferred for all further proceedings and entry of judgment. Before the Court are *Plaintiff's Motion for Summary Judgment*, filed October 16, 2011 (doc. 17), and *Defendant's Motion for Summary Judgment*, filed November 15, 2011. (doc. 18.) Based on the relevant filings, evidence, and applicable law, Plaintiff's motion is **GRANTED**, Defendant's motion is **DENIED**, and the case is **REMANDED** to the Commissioner.

**I. BACKGROUND**[1]

**A.      Procedural History**

Reginald Jerome Hall (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for supplemental security income under Title XVI of the Social Security Act. (R. at 27.) On December 3, 2004, Plaintiff

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "R."

applied for supplemental security income, alleging disability since November 1, 1992, due to "emotional and mental developmental problems" and "pain in [his] side." (R. at 70-72, 148). His application was denied initially and upon reconsideration. (R. at 28-38.) He timely requested a hearing before an Administrative Law Judge (ALJ). (R. at 39.) He did not appear at his hearing scheduled for August 22, 2006, and the ALJ dismissed his hearing request two days later. (R. at 1026-30.) On January 12, 2007, the Appeals Council remanded the case to allow a hearing. (R. at 29I-29J.) Plaintiff testified via telephone at a hearing held on December 19, 2007. (R. at 1031-57.) On January 25, 2008, the ALJ issued a decision finding Plaintiff was not disabled. (R. at 528-36.) On July 23, 2009, the Appeals Council granted Plaintiff's request for review of the ALJ's decision and remanded the case for a new hearing. (R. at 539-40.) On November 3, 2009, the ALJ attempted to hold a new hearing but continued it due to a scheduling error. (R. at 1058-61.) Plaintiff personally appeared and testified at a hearing held on December 3, 2009. (R. at 1062-85.) On March 3, 2010, the ALJ issued a decision finding him not disabled. (R. at 17-27.) He appealed, and the Appeals Council denied his request for review on July 1, 2011, making the ALJ's decision the final decision of the Commissioner. (R. at 7-10.) He timely appealed the Commissioner's decision pursuant to 42 U.S.C. § 405(g).

**B.**    **Factual History**

**1.**    **Age, Education, and Work Experience**

Plaintiff was born on March 23, 1964. (R. at 1068.) At the time of the hearing before the ALJ, he was 45 years old. (*Id.*) He claims to have a general equivalency degree (GED) and has no past relevant work. (R. at 26, 1093.)

### 2.      Medical, Psychological, and Psychiatric Evidence

On March 2, 2001, Plaintiff received psychological treatment while incarcerated at the Texas Department of Corrections (TDC).  (R. at 164-66.)  He complained of hearing voices and having difficulty relaxing and sleeping.  (R. at 164.)  Daniel Owen, the psychiatric nurse, noted that his appearance and behavior were "unremarkable," his speech was "spontaneous," his affect was "neutral," his thought processes were "intact," his thought content and cognition were "clear," and he did not have any suicidal or homicidal ideations.  (*Id.*)  Dr. Carpenter, the treating psychiatrist, discussed anger management techniques with him and advised him to "set goals for himself and start rebuilding his life."  (R. at 165.)

On September 28, 2004, while still in prison, he was involved in a fight and sustained fractures to his right middle finger and his nose.  (R. at 512-15.)  An x-ray of his hand showed a "severe anterior bowing deformity at the fracture site." (R. at 221, 450.)  His right hand was placed in a cast to protect his broken finger.  (R. at 459.)  He subsequently underwent physical therapy for his finger at Parkland Hospital.  (R. at 421-25.)  An x-ray taken on July 12, 2006 revealed that his finger continued to be deformed, but it showed "no evidence of acute fracture." (R. at 498.)  Months after the fight, his nose fracture continued to cause him difficulty breathing, and he underwent rhinoplasty surgery to repair his nasal septum on February 3, 2005.  (R. at 228-39.)

On December 8, 2004, after he was released from prison, he presented at Dallas Metrocare Services to begin mental treatment. (R. at 170-78.)  He appeared to be angry, worried, distracted, and "fragmented at times-jumping from one topic to another." (R. at 172.)  He told the examining clinician that it was "because he [had] fried his brain on drugs." (*Id.*)  He reported seeing shadows and images; feeling sad, withdrawn, and isolated; and worrying excessively. (*Id.*) He also stated that "[he] could get a hundred guns in east Dallas, if [he] wanted to." (*Id.*)  James Baker, M.D., the

- 3 -

treating psychiatrist, diagnosed him with substance induced psychotic disorder with hallucinations and asthma, and assigned him a Global Assessment of Functioning (GAF) score of 38.  (R. at 170.) He prescribed Plaintiff Celexa, Trilafon, Cogentin, and Trazadone, and informed him about the medications' purpose and dosage and the importance of keeping his appointments.  (R. at 171, 178.)

During a physical examination on May 10, 2005, Plaintiff reported suffering from "chronic nasal congestion."  (R. at 296.)  An electrocardiogram (EKG) revealed that he had "regular sinus rhythm at 54 beats per minute," that his P and T waves were "normal," and the overall interpretation was that of a "normal EKG."  (R. at 298.)  Frank J. Kromelis, M.D., the examining physician, also noted that Plaintiff complained of having had left-sided pain for 20 years, but he made "no findings ... to indicate any potential for intra-abdominal pathology."  (Id.)  He diagnosed Plaintiff with "flexion deformity of [his] right third finger ... without significant limitations" as well as chronic and mild asthma.  (Id.)

On May 20, 2005, Norvin Curtis, Ph.D., a state psychiatric consultant, conducted a Mental RFC Assessment and a Psychiatric Review Technique.  (R. at 302-19.)  He found that Plaintiff was markedly limited in his ability to understand, remember, and carry out detailed instructions; was moderately limited in 8 mental categories; and was not significantly limited in 10 mental categories. (R. at 302-03.)  He concluded that Plaintiff was able to complete simple tasks, could maintain concentration, and could adapt to changes and relate to others.  (Id. at 304.)  He diagnosed him with affective and substance addiction disorders, and made a "provisional" diagnosis that he suffered from mild mental retardation  (R. at 306-10.)  He determined that Plaintiff was moderately limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace.  (R. at 316.)  He assigned Plaintiff a GAF score of 50, and noted that he did not appear to be psychotic, and that there was "minimal evidence" of mental treatment while he was in

TDC custody.  (R. at 318.)

On May 31, 2005, James A. Wright, M.D., a state medical consultant, conducted a Physical RFC assessment.  (R. at 320-27.)  He determined that Plaintiff could occasionally lift and carry 50 pounds; could frequently lift and carry 25 pounds; and could stand, walk, and sit for 6 hours of an 8-hour workday.  (R. at 321.)  He noted that Plaintiff's right middle finger was deformed, and that he alleged suffering from asthma and chronic left-sided abdominal pain.  (*Id.*)  He determined that Plaintiff was limited in "[f]ingering (fine manipulation)," but concluded that his allegations about the severity of his symptoms were "not fully supported by the evidence obtained."  (R. at 323, 325.)

On July 13, 2005, Plaintiff voluntarily checked into Green Oaks Psychiatric Hospital and underwent a psychiatric evaluation.  (R. at 489.)  He complained about his bipolar condition and paranoia, and admitted to being non-complaint with his medications for three weeks.  (*Id.*)  He was diagnosed with psychotic disorder, episodic mood disorder, cannabis abuse, asthma, and a history of non-compliance.  (R. at 935.)  The next day, after evaluating Plaintiff and reviewing his chart, Dr. Baker prescribed him three medications and released him from his care.  (R. at 492.)  He advised him to return to Green Oaks if he experienced any suicidal or homicidal ideations.  (R. at 492, 816.)

While was incarcerated, Plaintiff underwent various physical and mental examinations by TDC.  X-rays of his chest taken on June 12, 2006, showed that he suffered from a tuberculosis infection but that he had no pulmonary disease.  (R. at 674.)  On July 13, 2006, he was prescribed a nine-month treatment for his tuberculosis infection.  (R. at 669.)  Mental treatment notes from January 3, 2007 state:

> Inmate has 366 days remaining on his 2 year sentence and has no where [*sic*] to live. He doesn't want to work. He says that he is a disabled mental patient who is suppose [*sic*] to get a welfare check and live in a government subsidized apartment ... No apparent mental or physical disorder ... The only problem he has is asthma.

- 5 -

(R. at 747.)  On July 17, 2007, he complained of having right shoulder pain and bilateral knee pain.  (R. at 651.)   Harold Clayton, M.D., the examining physician, took x-rays of Plaintiff's right shoulder, noted no underlying condition, and prescribed him medication.  (*Id.*)  He also noted that Plaintiff was "doing well," that he was "using [his] medications as instructed," and that "[n]o acute management was required."  (*Id.*)

On May 15, 2008, a police officer took Plaintiff to the Parkland Hospital Psychiatric Emergency Room after he told clinicians at Metrocare that he was having thoughts of hurting others, and that he had "aggressive urges toward women."  (R. at 786, 788, 902.)  At Parkland, he reported feeling depressed because he was a registered sex offender, had financial difficulties, and lacked housing and support.  (R. at 789.)  He was diagnosed with severe psychosis and involuntarily committed to Green Oaks Hospital overnight "for safety and stabilization."  (R. at 791, 797.)  There, he underwent another psychiatric evaluation and was diagnosed with paranoid schizophrenia, asthma, and history of past non-compliance.  (R. at 845.)  He was prescribed four medications and was released the next day with instructions to return for a follow-up appointment.  (R. at 875.)

On July 23, 2008, Barbara S. Fletcher, Psy. D., conducted a mental interview and status report.  (R. at 925-28.)  She noted that Plaintiff's "presentation was disheveled," and that he "appeared unbathed, poorly groomed, and smelled of the need to bathe."  (R. at 925.)  He was "tearful, agitated, circumstantial, and difficult to direct to the topic of assessment," and his "responses were at times incoherent."  (*Id.*)  His speech was clear and easily understood; his thought process was circumstantial and incoherent through much of the appointment; he reported being depressed and having frequent suicidal and homicidal ideations; his affect was agitated; and his "intelligence and fund of knowledge [were] estimated as low average."  (R. at 927.)  Dr. Fletcher's provisional diagnosis was "Schizoaffective Disorder Bipolar Type [and] alcohol abuse," and her

- 6 -

prognosis of Plaintiff was guarded, with the prognosis for his schizoaffective disorder being "somewhat better than the prognosis for [his] schizophrenia." (R. at 928.)

On September 23, 2008, Plaintiff did not present for his appointment at Metrocare, and clinicians attempted to contact him to reschedule. (R. at 921.) Clinician Michel J. Johnson noted on January 9, 2009, that Plaintiff was arrested on December 5, 2008, on aggravated assault charges. (R. at 922.) He also noted that a Metrocare representative faxed a list of Plaintiff's medications and diagnoses to the psychiatric department at TDC "for continuity of care." (*Id.*)

Plaintiff also received mental treatment at Life Net Community Behavioral Healthcare. (*See* R. at 971.) During a psychiatric evaluation performed on September 11, 2008, it was noted that he was paranoid, anxious, bored, depressed, fearful, and guarded; his affect was blunted; his appearance was fair; his memory was intact; his judgment was fair; he was oriented; and his thought process was linear and logical. (R. at 989.) Notes from November 12, 2009 stated that he was "doing well," was "stable," had "no new medical problems," "[knew] the risks and benefits of [his] med[ications] and agree[d] to proceed" with his treatment. (R. at 974.)

### 3.   Hearing Testimony

On December 3, 2009, Plaintiff, a vocational expert, and a medical expert testified at a hearing before the ALJ. (R. at 1063-1099.) Plaintiff was represented by an attorney. (R. at 1064.)

#### a.   *Plaintiff's Testimony*

Plaintiff testified that he was 45 years old and had a GED. (R. at 1068-69.) He had spent four to five months in prison for assault the previous year. (R. at 1066.) While incarcerated, he was committed to a psychiatric ward and received mental treatment. (*Id.*) He was not married but had a girlfriend. (R. at 1069.) He was able to read and write and did not have a driver's license. (*Id.*) He was homeless, and his only work consisted of handing out flyers. (R. at 1070.) He believed that

his "slowness and mentality" prevented him from working.  (R. at 1071.)  He stated that he could

not hold a job because of his "intellectual level," he could not communicate well, he got "hot a lot"

because of his "sickness," and because he got in "a lot of trouble."  (*Id.*)  He had been in and out of

prison since he was 17 years old.  (R. at 1072.)  When he was first incarcerated, he worked in the

fields until he got sick due to his asthma.  (*Id.*)  He was then assigned to the kitchen to assist with

serving.  (R. at 1073.)

Plaintiff drank alcohol daily when he was younger to deal with his depression and had last

consumed alcohol the previous month.  (R. at 1074.)  He also acknowledged that he drank a lot the

previous year because his girlfriend liked to drink.  (*Id.*)  He was still depressed and worried

excessively.  (R. at 1075.)  When asked by the ALJ, he testified that he drank "too much" beer and

hard liquor the prior week.  (R. at 1076.)

In response to counsel's question about whether he was taken by the police to Green Oaks

in 2008 after telling a Metrocare employee that he wanted to kill himself and his girlfriend, Plaintiff

stated that he was taken to Green Oaks, and that they kept him there overnight because they

erroneously thought that he wanted to kill somebody.  (R. at 1077-78.)  He had also received

treatment at Life Net for about two years.  (R. at 1079.)  His doctor prescribed him medication for

his insomnia and depression and to help calm his nerves.  (R.  at 1079.)  Although he was compliant

with his medications, he did not like taking them to the streets because others "always [took his]

stuff."  (R. at 1079-80.)

Plaintiff broke his right middle finger in a prison fight.  (R. at 1080.)  He stopped going to

therapy after being told by a physical therapist that he would not be able to move his finger if they

put a surgical plate in it.  (*Id.*)  His right hand hurt all the time, he had trouble using it, and he could

not "even snap [his] fingers."  (R. at 1081.)  He could pick up a cup of coffee with his right hand but

he preferred using his left hand.  (*Id.*)

Plaintiff also had abdominal pain on his left side and complained that it had been hurting "for too long."  (R. at 1082.)  He had been suffering from abdominal pain since the 1980s and did not know what caused his abdominal pain, but his doctors had told him that he probably drank too much coffee and smoked too many cigarettes.  (*Id.*)  He had reconstructive surgery on his nose for his "breathing [problems] and stuff like that," but he could not remember when that was.  (R. at 1083.)  Even after the surgery, he still had difficulty smelling and breathing, especially in hot weather.  (*Id.*)  He could breathe better when the air was cold.  (*Id.*)

Plaintiff sometimes rode the bus but didn't know his way around town and would have to ask the driver where to get off.  (R. at 1084.)  He was in special education classes until the 10th grade and always had difficulty getting around on his own.  (R. at 1085.)

b.      *Medical Expert's Testimony*

Barbara Felkins, M.D., testified as medical expert (ME). (R. at 1062-64, 1085-96.)  Dr. Felkins opined that Plaintiff could perform simple work that did not require constant fingering or keyboarding.  (R. at 1089.)  His drug and alcohol abuse was a material factor to his mental impairments, and she noted his comment to Metrocare clinicians that "he believe[d] he fried his brain on drugs." (R. at 1089-90.) (*See also* R. at 366.)  She also noted that Plaintiff had not treated his abdominal pain on a regular basis and that his grip was "five out of five on the right."  (R. at 1091.)  She concluded that absent his drug abuse, he would be able to perform light work.  (*Id.*)

c.      *Vocational Expert's Testimony*

Susan Brooks, a vocational expert (VE), also testified at the hearing.  (R. at 1062-64, 1092-98.)  The ALJ asked her whether a hypothetical individual of Plaintiff's age, educational attainment, and vocational history could perform any work with the following limitations: lift no more than 20

pounds occasionally, 10 pounds frequently; stand, walk, and sit for up to six hours a day; occasional fingering with the right hand; no climbing of ladders, ropes, or scaffolds; no exposure to concentrated dust, gas, fumes, or poor ventilation; the ability to understand and carry out simple instructions; no more than incidental interaction with co-workers and supervisors; no more than superficial interaction with the public; and the ability to adapt to a routine work environment. (R. at 1093-94.)  The VE testified there were no jobs that Plaintiff could perform. (R. at 1094.)

After Dr. Felkins clarified that she believed Plaintiff could finger frequently, but not constantly, the ALJ posed a second hypothetical question, changing the fingering ability to "frequent, but not constant." (R. at 1094-96.)  The VE testified that the hypothetical claimant could perform several light, unskilled positions, including: a shoe packer with 13,000 positions in Texas and 217,000 nationally; an inspector or sampler with approximately 10,600 positions in Texas and 148,000 nationally; and a photocopy machine operator with approximately 900 positions in Texas and 12,700 nationally.  (R. at 1096-97.)

## C.   **ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion on March 3, 2010. (R. at 17-27.)  At step one, he determined that Plaintiff had not engaged in substantial gainful activity since December 3, 2004, his application date.  (R. at 19.)  At step two, he found that Plaintiff had the following severe combination of impairments: major depressive disorder, borderline intellectual functioning, asthma, and polysubstance abuse.  (R. at 20.)  At step three, he determined that Plaintiff's impairments, including his substance abuse disorders, met sections 12.04 and 12.09 of 20 C.F.R. Part 404, Subpart P, App'x 1 (20 C.F.R. § 416.920(d)).  (*Id.*)  He determined that absent his substance abuse, Plaintiff would still have "major depression, borderline intellectual functioning and asthma," but he would not have an impairment or combination of impairments that met or

equaled any of the listed impairments. (R. at 22.)

Before proceeding to step four, the ALJ found that absent his substance abuse, Plaintiff would have the residual functional capacity (RFC) to lift 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for 6 of 8 hours; and engage in frequent but not constant fingering with his right hand. (R. at 22.) He added the following limitations to Plaintiff's RFC: he could not climb ladders, ropes, or scaffolds; would have to avoid concentrated exposure to dust, gas, fumes, and poor ventilation; would retain the ability to understand and carry out simple instructions; could have incidental interaction with coworkers and supervisors; and could adapt to routine work environment with superficial contact with the public. (*Id.*)

At step four, he found that Plaintiff had no past relevant work. (R. at 26.) At step five, based on the VE's testimony, he determined that considering his age, education, work experience, and RFC, Plaintiff could perform numerous jobs that existed in significant numbers in the national economy if he stopped his substance abuse. (R. at 26.) He determined that Plaintiff's substance abuse disorder was a contributing factor material to the determination of disability, given that he would not be disabled if he stopped the substance use. (R. at 27.) He concluded that Plaintiff had not been disabled within the meaning of the Social Security Act at any time between the date of his application through the date of the ALJ's decision. (*Id.*)

## II. ANALYSIS

### A.  Legal Standards

#### 1.  Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion.  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id.*  Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *Id.*

## 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). The Commissioner utilizes a sequential five-step inquiry to determine whether an adult is disabled and entitled to benefits under the Social Security Act:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.

- 13 -

*Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3.    Standard for Finding of Entitlement to Benefits

Plaintiff asks the Court to reverse the Commissioner's decision and award benefits, and in the alternative, to remand the case for further consideration.  (Pl. Br. at 25-26.)

When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits."  *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, *10 (N.D. Tex. Sept. 22, 2009) (adopting recommendation of Mag. J.).  The claimant must carry "the very high burden of establishing 'disability without any doubt.'"  *Id.* at *11 (citation omitted). Inconsistencies and unresolved issues in the record preclude an immediate award of benefits.  *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005).  The Commissioner, not the court, resolves evidentiary conflicts.  *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

### B.    Issues for Review

Plaintiff presents the following issues for review:

1.    The ALJ failed to apply the appropriate legal standard established by the Fifth Circuit Court of Appeals in deciding which of Plaintiff's impairments are severe at Step 2 of the Sequential Analysis;

2.    The hypothetical question to the VE did not reasonably incorporate all disabilities of the claimant recognized by the ALJ;

3.    The ALJ's RFC is fatally flawed.  The RFC is not based on substantial evidence; and the ALJ failed to perform a function-by function assessment of Plaintiff's mental abilities when determining the MRFC;

4.    The ALJ's finding that Plaintiff is not disabled if the Plaintiff stops substance use,

is not supported by substantial evidence and does not follow the procedures set forth in 20 C.F.R. § 416.935; [and]

5.      The ALJ did not comply with Social Security rulings in making the implicit determination that Plaintiff's non-compliance with medical treatment precludes disability.

(Pl. Br. at 1-2.)

## C.      <u>Severity Standard</u>

Plaintiff argues that remand is required because the ALJ applied an incorrect severity standard at step two of the sequential evaluation process. (Pl. Br. at 8-12.)  The Commissioner responds that the ALJ applied the correct severity standard at step two because he cited to *Stone* as required by that case.  (D. Br. at 6.)

### 1.      *Stone* (*De minimus*) Standard

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  Finding that a literal application of these regulations would be inconsistent with the Social Security Act, the Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work."  *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104-05 (5th Cir. 1985).  Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity."  *Id*. at 1104.

To ensure that the regulatory standard for severity does not limit a claimant's rights, the Fifth Circuit held in *Stone* that it would assume that the "ALJ and Appeals Council have applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference

to this opinion or another of the same effect, or by an express statement that the construction we give to 20 C.F.R. § 404.1520(C) (1984) is used." *Id*. at 1106; *accord Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). Notwithstanding this presumption, the Court must look beyond the use of "magic words" and determine whether the ALJ applied the correct severity standard. *Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir. 1986). Unless the correct standard of severity is used, the claim must be remanded to the Commissioner for reconsideration. *Stone*, 752 F.2d at 1106.

Here, the ALJ first stated that "[a]n impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities." (R. at 18) (citing 20 C.F.R. § 404.1520(c)). He further stated that "[a]n impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." (*Id.*) (citing 20 C.F.R. §§ 404.1521 and 416.921 and Social Security Rulings ("SSRs") 85-28, 96-3p, and 96-4p). These statements are inconsistent with the *Stone* holding that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone*, 752 F.2d at 1104-05. Unlike the standard set out by the ALJ, *Stone* provides no allowance for a minimal interference with a claimant's ability to work. While the difference between the two statements appears slight, the ALJ's standard is not an express statement of the *Stone* standard.

Although the ALJ specified that "[a]ll impairments ha[d] been considered under the standard set forth in *Stone v. Heckler*" after listing Plaintiff's impairments at step two, the Court must look beyond these "magic words" to determine whether he applied the Fifth Circuit's construction of a

severe impairment. *See Hampton*, 785 F.2d at 1311; (R. at 21.)  After step three but before assessing

Plaintiff's RFC, the ALJ determined that if Plaintiff stopped his substance abuse, "the remaining

limitations would cause *more* than a *minimal* impact on [his] ability to perform basic work activities;

therefore, [he] would continue to have major depression, borderline intellectual functioning and

asthma." (R. at 21.) (emphasis added).  At this point, the ALJ engaged in a literal application of the

regulations because his finding allowed for a "minimal" interference by Plaintiff's impairments on

his ability to work.  This was inconsistent with the *Stone* standard, which allows no such

interference.  Notwithstanding his citation to *Stone*, the ALJ applied an incorrect severity standard

in the disability analysis.  *See Garcia v. Astrue*, No. 3:08-CV-1881-BD, 2010 WL 304241, at *3

(N.D. Tex. Jan. 26, 2010) (noting that courts in this district have consistently rejected, as

inconsistent with *Stone*, the same language that the ALJ used in this case).

### 2. Consequence of *Stone* Error

The Commissioner argues that remand is not required because *Stone* applies only to cases

"in which the administrative decision was made against disability at step two on grounds of non-

severity," and here the ALJ proceeded to step five.  (D. Br. at 6, citing to *Stone*, 752 F.2d at 1101.)

Plaintiff responds that remand is required because as a result of his *Stone* error, the ALJ failed to

include his right middle finger deformity, chronic abdominal pain, and chronic nasal congestion as

severe impairments.  (Pl. Br. at 10-12.)

In *Jones v. Astrue*, 821 F. Supp. 2d 842, 849 (N.D. Tex. 2011) (Toliver, M.J.), the court

noted that while this district had routinely reversed and remanded cases where the ALJ committed

*Stone* error, the Commissioner for the first time had "squarely presented and adequately briefed" the

argument that *Stone* error is harmless if the ALJ continues beyond step two of the disability analysis.

In deciding the issue, the court focused on the language in *Stone* that "[i]n view of ... [its] recent experience with cases where the *disposition has been on the basis of nonseverity*," the Fifth Circuit would "in the future assume that the ALJ and Appeals Council have applied an incorrect standard to the severity requirement" and mandate reversal.  *Id.* (citing *Stone*, 752 F.2d at 1106) (emphasis in *Jones*).  It also examined post-*Stone* cases where the Fifth Circuit found that reversal on *Stone* error was not required if the ALJ had proceeded past step two of the disability analysis.  *Id.* (citations omitted).  The court concluded that *Stone* error was not grounds for reversal where the ALJ "proceeded beyond step two ... in discussing all of [the claimant's] impairments."  *Id.* at 851.

Noting the *Jones* decision, the court in *Jones v. Astrue*, 851 F. Supp. 2d 1010, 1018 (N.D. Tex. 2012) (McBryde, J.), subsequently also concluded that *Stone* error was not grounds for automatic reversal and remand.  It likewise closely examined *Stone* as well as post-*Stone* cases where the Fifth Circuit held "that an error in the [ALJ's] analysis at step two does not require a remand when the ALJ has gone beyond the second step."  *Id.* at 1016-17 (citing to *Harrell v. Bowen*, 862 F.2d 471 (5th Cir. 1988) (per curiam).  It also examined a Fifth Circuit case finding "no error similar to that found in *Stone*" where the ALJ applied an incorrect severity standard but proceeded to consider the effects of the claimant's disputed impairment on his ability to work at steps four and five, and therefore did not deny benefits "prematurely ... based on [that] improper determination of 'non-severity.'"  *Id.*  (citing to *Jones v. Bowen*, 829 F.2d 524, 526 n.1 (5th Cir. 1987) (per curiam)).  Based on its analysis, the court found that *Stone* did not create an exception to established harmless-error policy in the Fifth Circuit, which is to "preserv[e] a decision under review to avoid waste of time unless the error had an adverse effect on the substantial rights of a party", and that application of harmless-error analysis to *Stone* error cases where the ALJ proceeded past step two is consistent

with Fifth Circuit law.  *Id.* at 1016-18.

As recently noted in *Goodman v. Commissioner,* No. 3:11-CV-1321-G, Findings, Conclusions, and Recommendation at 16 (N.D. Tex. Sept. 10, 2012) (Ramirez, Mag. J.), these well-reasoned cases compel reconsideration of prior holdings that *Stone* error mandates remand.  The Fifth Circuit has explained that "*Stone* merely reasons that the [severity] regulation cannot be applied to summarily dismiss, *without consideration of the remaining steps in the sequential analysis,* claims of those whose impairment is more than a slight abnormality." *Anthony v. Sullivan*, 954 F.2d 289, 294 (5th Cir. 1992) (emphasis added).  *Stone* error is not grounds for automatic reversal and remand if the ALJ continues beyond step two of the disability analysis, and application of the harmless-error analysis to those cases is appropriate.  *See Goodman*, F.C.R., at 16-17.

### 3.      Harmless Error Analysis

In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error.  *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Here, at step two, the ALJ determined that Plaintiff had the following severe combination of impairments: major depressive disorder, borderline intellectual functioning, asthma, and polysubstance abuse.  (R. at 20.)   After step three, he found that if Plaintiff stopped his substance use, he would have the following RFC: could lift 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for 6 of 8 hours; could engage in frequent but not constant fingering with right hand; could not climb ladders, ropes, or scaffolds; no exposure to concentrated dust, gas, fumes, or poor ventilation; could understand and carry out simple instructions; could have incidental interaction with coworkers and supervisors; and could adapt to routine work environment with

superficial contact with the public.  (R. at 22.)

The ALJ explained that in assessing Plaintiff's RFC, he had considered "all [of Plaintiff's] symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence." (R. at 22.)  Consideration of "all of the relevant medical and other evidence" as well as all "medically determinable impairments … including [those] that are not 'severe'" is required when determining a claimant's RFC.  *See* 20 C.F.R. § 404.1545(a)(1)-(3).  The ALJ noted the medical expert's testimony that during a physical examination while in TDC custody, "[Plaintiff's] grip was unaffected by [his] finger deformity," and that his grip strength was "5 out of 5 on the right." (R. at 24, 726, 1091.)  He adopted the medical expert's opinion that Plaintiff "could perform light work in light work in light of [his] deformed finger." (R. at 24; 1091.)  He considered the effects of Plaintiff's deformed finger on his ability to work and allowed for its limitations by precluding him from constant fingering or keyboarding in his RFC.  (R. at 24, 1091).  He noted the medical expert's testimony that Plaintiff had not received treatment for his abdominal pain on a regular basis, and thereby implicitly found that it did not interfere with his ability to perform light work.  (R. at 24, 1091.)

Because Plaintiff had no past relevant work, the ALJ proceeded to step five, and accounting for Plaintiff's RFC, he concluded that Plaintiff could perform numerous jobs existing in significant numbers in the national economy.  (R. at 32.)  Although he did not find that Plaintiff's deformed right middle finger and chronic abdominal pain were severe impairments at step two, he still considered their effects on his ability to work throughout the disability analysis as required by the regulations.  Therefore, it is  inconceivable that he would have reached a different conclusion regarding the effects of Plaintiff's deformed middle finger and chronic abdominal pain on his ability

to work if had applied the *Stone* severity standard at step two.  Accordingly, the ALJ's failure to apply the *Stone* severity standard at step two was harmless error as to these alleged impairments.

Nonetheless, the ALJ did not include, or even mention, Plaintiff's alleged chronic nasal congestion in his decision.  Plaintiff alleges that the nose fracture from the September 2004 prison fight did not heal properly and has caused him difficulty breathing ever since.  (Pl. Br. at 3); (R. at 228, 1083.)  He underwent reconstructive surgery in February 2005 to repair his nasal septum because it was too thin.  (R. at 228, 239-42, 1083.)  During a physical examination on May 10, 2005, he was still complaining of chronic nasal congestion.  (R. at 296.)  At the hearing before the ALJ, he testified that because his "nostrils stay hot ... all the time", he has difficulty smelling and breathing in hot environments.  (R. at 1083.)  The ALJ did not find Plaintiff's alleged chronic congestion to be a severe impairment or include it in his "severe combination of impairments" at step two of the disability analysis.  (*See* R. at 20.)  Because he did not address this alleged impairment at any step of the analysis, it is unclear whether he purposefully dismissed it as non-severe based on his application of an incorrect severity standard at step two.  He did not consider the effects that this alleged impairment may have had on Plaintiff's ability to engage in substantial gainful activity.  He did not consider the evidence of this alleged impairment in assessing Plaintiff's RFC as required by the regulations.  *See* 20 C.F.R. § 404.1545(a)(1)-(3); (*see also* R. at 22-26.) Consequently, he did not consider the effects that it may have had on Plaintiff's ability to work at step five of the disability analysis.  While he determined that Plaintiff "would have to avoid concentrated exposure to dust, gas, fumes and poor ventilation," it is not inconceivable that his RFC assessment would have also limited Plaintiff's exposure to other environmental elements, such as extreme heat or humidity, if he had considered his alleged breathing difficulties.  (*See* R. at 22.)

- 21 -

Accordingly, the ALJ's failure to apply the *Stone* severity standard at step two was not harmless error as to this impairment and requires remand.

The Court does not reach the remaining issues because the ALJ's determination on reconsideration will affect them. Because there are unresolved issues in the record, Plaintiff is precluded from an immediate award of benefits.

### III.   CONCLUSION

Plaintiff's motion for summary judgment is **GRANTED**, Defendant's motion for summary judgment is **DENIED**, and the case is **REMANDED** for reconsideration.

**SO ORDERED**, on this 20th day of September, 2012.

*Irma Carrillo Ramirez*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must file and serve written objections within fourteen (14) days after being served with a copy. A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made. The District Court need not consider frivolous, conclusory or general objections. A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985)*; Perales v. Casillas*, 950 F.2d 1066, 1070 (5th Cir. 1992). Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten (10) days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

*Irma Carrillo Ramirez*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE